11-2615, 11-2617, 11-2622, Jennifer Garland v. Sybaris Clubs International With those who are going to argue, please step up and identify yourselves. Good morning, Your Honor. My name is Bob Sheridan from Clifford Law Offices, and it is my privilege to argue on behalf of the plaintiff, Jennifer Garland. Good morning, Your Honor. My name is Joe Bosco of LaRosa and Bosco, arguing on behalf of H.K. Golden Eagle. Good morning, Your Honor. It's Michael McGrory from Smith-Adamson. I'll be arguing on behalf of the estate of Knutson. Good morning. I'm William Dionne from True Hawk in Texas, and I'll be arguing on behalf of the defendant, Howard Levinson, and his corporation, Park. Good morning, Your Honor. I'm John S. Hoff, H.O.F.F. of Hoff Law Group, for the defendant, Sybaris. So, I bumped into Mr. Bosco on the way up, and he said, you guys had broken it down into three arguing, and we're not going to restrict you too tightly on time, in light of the number. So, that doesn't mean we want to be here at 2 o'clock this afternoon, but try anyway, and we may or may not have a lot of questions. With that, you may proceed. Thank you, Your Honor. One thing I did tell Mr. Bosco, I wouldn't waste your time on law of the case, anybody. I don't consider that to be an issue. I think that the issues of those two prior appeals are separate and distinct, and they have no real bearing on this case. So, with that in mind, proceed. Thank you, Your Honor. Well, that's going to shorten my argument. This is the third time that the case has been before this court. As Your Honor noted, on the two prior occasions, it dealt with separate issues. One of those issues was whether or not Illinois would recognize a duty of what's called educational negligence, and the court, after having considered matters, decided that it would not. But before Your Honor, today is a case which involves two well-recognized duties by Illinois, what's known as negligent entrustment, and the duty to supervise, where it has been voluntarily undertaken. So the existence of a duty is not an issue in this case. Whether or not the facts of this case constitute a breach of that duty, whether the circumstances of this case indicate that that duty has arisen and will be imposed upon the defendants, those are indeed questions, but whether or not a duty exists in Illinois, that is not a question. We believe that the record in this case, properly considered, in the light most favorable to the plaintiff, with all reasonable inferences being drawn in the plaintiff's favor, shows that the case is well within Illinois's established duty rules for those two concepts of liability. You state that the pilot was not qualified to fly the plane, but the FAA gave him a license to fly the plane. Yes. So Your Honor has cut to the chase. One of the questions that's involved in this case is whether or not the fact that he has an FAA license, and in fact we'll go further because it's not a controversy, an FAA license to fly this class of plane, automatically precludes any further inquiry as to whether or not, in fact, he was suitable, fit, or if you like the word qualified, competent, or able to fly this particular plane under these circumstances. And in fact, I submit that one of the major arguments of the defendants when they rise to address the court will be that in fact it is preclusive, and the fact that he has such a license ends the argument. But I think it does not, and I think it does not for a number of reasons. The first of the reasons is this. It makes no sense. If we were talking, for example, about a driver's license, which is the ordinary circumstance in which the negligent entrustment cases have historically arisen in Illinois, the fact that a person does not have a driver's license would certainly weigh heavily in the idea that it was negligent to entrust it to that person. But the fact that the person does have a driver's license, if there are other circumstances that are compelling, would not, I think, in Illinois preclude finding that it's unreasonable to entrust a car to such a person. What if they had a physical disability that prevented them from operating a car properly, even though they had a license? What if they were in a state of great emotional distress so that a reasonable person would not put a car into their hands? I think that Illinois' general law and the rules that have been articulated would not equate qualification with the having of a license. The rule, as expressed by the Supreme Court in a case called Teeter v. Clements, cited repeatedly, is whether or not the entrustor knows that the person he's entrusted it to is incompetent, unskilled, or is likely to use it in a manner as to create an unreasonable risk of harm. And the fact that a person has an FAA license to fly a plane does not automatically and completely answer that question. So that's the first thing to the suggestion that having an FAA license simply closes down the inquiry with respect to entrustment. The second one is this, that the FAA, as I believe Silvers argues, is a complex and well-regulated body of law, but it's well understood that that regulation used to apply, for example, to airline ticket prices. That's gone. It applies to a number of things, but it does not apply to tort actions for injury. There's a vast body of law that deals with this arising from other cases. Texas is notorious for having a law on this issue. I didn't cite that because it's far from home, but the Seventh Circuit here in Bennett v. Southwest Airlines, which we did cite, said that torts arising from airplane operations are not protected by federal law. So therefore, the fact that Mr. Tort had a license made it possible for him to fly the plane legally, but that does not, we submit, automatically mean that it was reasonable to let him fly this plane under these circumstances in light of what the defendants knew, Mr. Knutson and Mr. Robinson, or what they ought to have known. I will not go through all the facts of what they ought to have known in an exercise of reasonable owners of this plane. You've repeated them several times in your brief. Yes, but this we do know, that Mr. Levinson had flown with Mr. Tort shortly before the event. He had criticized the way that he handled the plane. There is the uncontradicted evidence that his view of the matter was that he flew too fast. The kind of plane he traditionally flew is, in fact, a much faster plane. It has much more engine power, and yet the plane that we were flying in this case is a heavier plane. The result is what's called an increase in stall speed. That means that the plane will stall at a higher speed. So that he was critical of this. Even at his deposition, after he'd been sued, he acknowledged that there were problems with the way that Turek handled the throttle, and that this was a safety issue. And so the defendants have argued, and at the jury trial we hope that we will be awarded, will doubtless be free to argue again that this in and of itself, actually there's more, but this sort of thing should not be sufficient to impose liability upon Mr. Levinson and Mr. Knudsen. Okay, but what about the corporations? How do we hold them in? Okay, the corporations. We have Golden Eagle, and we have Sybris. Now, this flight, we said that it was in course of the business or an aid of the business of both of these corporations, but for different reasons. Golden Eagle was looking for a partner to participate in the plane, so they had an economic interest in vetting Turek to see if he would qualify. Sybris was in the business of running resorts and hotels, and Knudsen, who was their founder and president, often went to places to look at new sites, and he was returning to this location to look at another site, and to have a meeting with a man whose business it was to help him find sites and to develop them. That's clearly in the course of Sybris' business. Now, Knudsen could have taken this flight, flown the plane himself, crashed into a house, and would there have been any question in your honor's mind that this flight was in the course of Sybris' business and would be vicariously liable? I don't believe there would be. In this case, he took the flight for the same business purposes. But in so doing, he allowed the plane to be flown by Mr. Turek. How does that change the business purpose of the flight? They say that the flight is a terra gentile. It was just a cover, a beard, as it were, for vetting Turek. I don't think a jury defied that. I think a jury could agree with the plaintiff that it was an occasion for looking at Turek. It was a flight that he was going to make, and he let Turek fly it so he could see how he was doing. But Turek is not the reason for that flight. That flight has its own business reason. He allowed Turek to fly it because he wanted to see how it went. That was an act of diligence in how he conducted his flight. Have I answered your honors' questions? Well, your honors has pretty much covered most of my points. Well, I'm not quite clear on this Sybris liability here. Okay. Sybris would argue, well, this guy went out of town, but it's just like if he was on a commercial flight with Newsom being there. What makes the difference between the flight that was taken here and any standard commercial flight that one of the employees would have taken? Well, only this, is that in an ordinary standard commercial flight, Mr. Newsom would not have had the ability to impact the negligent operation of the plane. Presumably, in this case, Mr. Newsom did have something to do with the negligent operation of the plane by putting Mr. Turek into the pilot seat. Now, everybody knew that there was a problem with the way that Turek flew this particular plane, the Cessna. Mr. Levinson knew it. If Mr. Newsom didn't know it before he left, I submit the evidence that he did because, as Mr. Levinson himself said to the police at the time, Newsom was going to supervise the flight. In his deposition, he said, he gave the testimony, we had misquoted this and were brief, but what we had said is you better go with him. That's not what he said. What he said was that go with him and see how he does. So clearly there were questions about it, and if Mr. Newsom was going to supervise and to see how he did, then he had questions too. But whatever questions he had on the flight out were certainly augmented by the time he arrived when he complained to the man he met with about the way that Turek had operated the plane in his initial takeoff and how he was dissatisfied. And all of those things, I think, are for the jury to decide whether or not they are sufficient to meet the Illinois standard that a reasonable person would not have let this man control the airplane. But isn't everything dealing with Knutson basically circumstantial? Yes. To his supervision? Yes, yes it is, Judge. And since we're going to talk about circumstantial now, also the approximate cause and even negligence evidence is circumstantial. Because as the trial court noted, and there's a theme which the defendants have taken up as reiterated, is nobody actually knows what happened in the cockpit of the plane. So that the case, if it's going to go forward for the plaintiff, must rest upon circumstantial evidence. For this, we have relied upon the Illinois Supreme Court's case in Moore v. Walter. A case that's not... Which they don't agree with. I agree with it. Your Honor doesn't agree with it? No, I said they don't agree with it. No, they don't agree with it. And many appellate court cases have misquoted it. But the language of the case, which I think by zeal I may have quoted twice at the same brief, is that A, circumstantial evidence is sufficient to support a finding, to support a verdict. And B, and here's the matter of controversy, it need not be the only explanation for the event, though it must be a reasonable explanation for the event. So what are the facts in the case that could be shown to the jury that will raise an inference, that will constitute confident circumstantial evidence of his failure to supervise, that the deficiencies of Turek were the cause of this event? We have a good deal of evidence on that point. Some of it comes from his instructors about how he banked his claim too steeply. And the result of banking it too steeply is that it raises the speed in which a plane stalls, raises the stall speed. That means that the plane will stall at a higher speed. You don't want that. You don't want the plane to stall at all. The higher the speed, the more likely the stall becomes. We have the evidence, Mr. Levinson's observation before this even happened, that he likes to fly the plane fast and then throw out the brakes. We have his deposition testimony about how he mismanaged the throttle. That was all quite exciting in the Baron, a lighter plane that can land at a significantly lower speed. So those were his habits, Turek's habits. Those were his deficiencies. We have the government report of the accident. And this is not a matter of opinion, what we know now. This is a matter of fact. They have the radar. When this plane stalled, it was only going 82 knots. The manuals say that the plane must be going 103 knots in order to have a safe landing. Mr. Levinson testified that he always lands it at 109. The plane was going too slow, even in the best of conditions. That just was his modus operandi. That was what was wrong with how he operated a plane if the plane was a Cessna. That's what was okay in the Baron, the plane that he ordinarily flew. That is, we submit sufficient circumstantial evidence of a number of facts. First, that he negligently operated the plane. He slowed it down to a point where everybody agrees, including the owners and the manufacturers, that it's below the speed at which you can land this airplane. Number two, it explains what happened. The plane, just a little bit less than a mile from the airport, suddenly stalled and fell to the ground. It was going too slow. If he'd been up higher, then he might have been able to recover. He was coming in for a landing. So all the things that he did wrong, all the things that have been commented about his deficiency, the things that Mr. Levinson had talked about, the things that his teachers had talked about, are demonstrably the reason why this crash occurred. And while it's circumstantial evidence, because nobody sadly survived that crash, to tell us and the court what they recall, I think it's compelling evidence. And I think it's evidence that a jury is entitled to hear, and I think it's evidence upon which they could rightly, if they so chose, find a verdict for the plaintiff. I think Your Honors have taken my list. I think all the matters have been discussed. So unless Your Honors have any further questions, I will sit down and, with Your Honors' permission, have a few minutes to reply. Thank you. Good morning, Your Honors. For my portion of this oral argument, I will address the issue of negligent entrustment. I am also prepared to discuss and explain why experts cannot create facts. Mr. McGorry will then address the issues of negligent supervision and standard of proof. And Mr. DeYoung will then deal specifically with the plaintiff's factual allegations as they relate to these issues. And Mr. Hoff, if there's any further questions regarding civil service or FAA regulations, we'll be happy to address those issues as well. In this appeal, the entry of summary judgment should be affirmed because the court reached the correct conclusion. There was insufficient evidence, one, that Turek was incompetent, inexperienced, or reckless, two, that the defendants knew that Turek was incompetent, inexperienced, or reckless, or three, that the negligent entrustment of the aircraft was the proximate cause of this accident. How do you get over what the NTSB said? The NTSB, that the accident happened because the plane was stalled. That is a fact, a momentary negligent act. By analogy, just because an experienced car driver, I've been driving cars myself for over 40 years. If I run a stop sign today and cause an accident, that doesn't mean I'm incompetent, reckless, or inexperienced. That means that I had a lapse in judgment and I committed a negligent act. A momentary lapse in judgment is a negligent act, but it does not equate to incompetence, recklessness, or inexperience pursuant to the law on negligent entrustment. One of the issues, I'm sorry, Susan. Well, what about the inability to do night landings? He hadn't had enough experience to even be able to qualify to do night landings. Well, I'd like to address that on a number of different levels. First of all, Mr. Sheridan talked about his argument that duty is not an issue in this case. We completely disagree with that. And the fact in Evans is that there has to be some type of a red flag or a trigger to indicate to- You're creating a new element, is what I think. But go ahead. Okay, well, in reading the cases in Evans, there has to be some type of additional information which would indicate to Mr. Levinson and Mr. Knudson that there was, in fact, an issue with regard to incompetence or inexperience. That's not the issue in this case. And I don't think, according to the law in Evans and its progeny, that there would be a duty for Mr. Levinson or Mr. Knudson to actually have to go through and examine and go through his logbooks to determine for themselves whether or not he was night competent. Well, since John Kennedy Jr. crashed this plane some 14 years ago, I think in some sense the general public is aware that there's a difference between flying at night and flying during the day. Shouldn't the owners of this plane, who are flight instructors, at least knowing that there's going to be a flight at night at least have some duty to see if this pilot is capable of that? I think that as the pilot in command, Turok was responsible under the Federal Aviation Regulations to determine whether he was competent, whether he was prepared for this particular flight. And I don't think, under the law, there is a duty for either Mr. Levinson or Mr. Knudson to have that duty. This is just like the truck driver in the Dow v. Birmingham Steel case, which the court held. That truck driver was in the best position to determine whether he was too fatigued to make the trip in that particular case. Now, isn't Turok, doesn't he contribute to the risk based on them allowing him to do something when he has not been certified to do it? The night flying and one of the other things that he hadn't done. Doesn't that create a contributory issue, which then forces us to say, clearly, there's an issue of fact then. And if there's an issue of fact, we have to send it back. Whether it would win, probably not, but is there sufficient there that it has to go back? Well, I think that Mr. DeYoung will be handling the issue of night currency as a factual issue in more depth. But let me say this. The contention assumes, incorrectly, that being night current under the FAR amounts to, or not being night current under the FAR amounts to incompetence. Lack of night currency simply means that Turok had not recently flown at night, not that he was incapable of flying at night. And if your honors, if I can point to the decisions of, I think it was Eric versus the estate of Waldheim, the fact that the motorcycle driver was unlicensed, did not have the proper certifications, did not mean that he was incompetent. This is the same analysis. But that doesn't still answer my question. Does that create sufficient of the potential of a contributory risk, which may be enough to force it to go back? I think that when we look at these cases and we look at what the courts have done in these cases, the Illinois courts, the public courts, the Supreme Courts, they're hostile to the use of negligent entrustment to make a second case out of one person's negligence. The courts, in what they've done, is they've drawn a line as a matter of law.  Every case that's dealt with this, they're never going to be blemish free. There has to be something, there has to be a line somewhere as a matter of public policy, or you're going to open the floodgates to negligent entrustment cases every time someone gets a speeding ticket, every time someone loses his license and gets his license back. There is no evidence that, and furthermore, there's the issue of proximate cause in that. There's no evidence that any of that was proximate cause in this case, either in fact or in law. The question also is, in viewing Mr. Turek's abilities, I believe that under the case law you have to look at the abilities in the aggregate, and that is you have to look at the fact that Mr. Turek was an experienced pilot. He was licensed to qualify to fly multi-engine aircraft. He had over 1,284 hours of total experience, including 1,050 hours of multi-engine time, and 29 hours in this particular, in the Cessna 421 aircraft. In addition, he had just finished make model specific training at Recurrent Training Center, past that, and even more importantly, he just had finished five hours where Mr. Levinson flew with him, flew with him in the pattern at Milwaukee Airport, observed his ability to fly, to land this particular aircraft, and did not think that he was incompetent or inexperienced. And furthermore, the other fact, I think that's very compelling, is the fact that Mr. Knutson was in the plane with him. Mr. Knutson did not think that he was incompetent or inexperienced to the extent that he entrusted Mr. Turek with his life. Going, but coming back, I'm not so sure. Well, there's no evidence to indicate that Mr. Turek... Other than his comments to, what was it, to McGinnis. Well, there's no evidence that he didn't, that any of his comments rose to the level where he took over the aircraft or had any concerns with regard to Mr. Turek's ability to safely bring that aircraft back and land that aircraft at Milwaukee Airport that night. Finally, there is no evidence that Turek's alleged incompetence, inexperience, or recklessness was the approximate cause of this crash. And there's insufficient evidence as either a factual cause or a legal cause in this case. Plaintiff cites to the fact that Mr. Turek flew too fast. Well, that would have been a good thing in this case, because he got too slow. These other issues deal with style. I just, there's nothing that rises in any of these facts to create a question of material fact that Mr. Turek was in any way inexperienced, incompetent, or reckless. For these reasons, if the court doesn't have any other questions of myself, I would ask that the court affirm the trial court's branding of summary judgment. Thank you. Thank you. Mr. McGorry and I decided to switch because of your questions. Yeah, you probably noticed that. He didn't like some of our questions. I'm interested in them, very interested in them, and they're quite a bit factual. And that was my area, so that's why he readily agreed. And I'd like to address also, from the factual perspective, some of your questions. Let's just go right into the night thing. You've really made an issue of the night flying. It's not just the night flying. I know it's not only. There were three things that he should have been certified, and then the fact that he wasn't, maybe they didn't know, but they should know. Well, that's the question, should they? So can I address that? That's what I'm saying. Yeah. Well, first of all, night flying currency is not a license. It's an entry in your logbook. Pilots, when they fly, they put it in their logbook. They keep their logbook in their desk, their drawer at home. And then if there's ever an issue, the FAA comes back and says, let's take a look at your logbook. And they look at your logbook to see if you've complied with the regulations. It's not any evidence in this case anywhere that it's customary to get out a pilot's logbook and review his logbook when you're going to let him fly your airplane. That would be the question. You might say to me, well, shouldn't he have gotten out his logbook and looked? Let's talk about that under the true facts. This man owned his own airplane, twin-engine Baron, kept at that same airport, which he flew all the time on business. He flew so often that Garland, in their brief before this court previously, referred to him as Morgan Stanley Air or Turek Inc. He flew so often on business that that was what argument he adopted when he was going after Morgan Stanley. He flew that often. Well, when they say everybody knew, what everybody knew is that he owned his own airplane and he flew. Now, is there a duty to not only know that he's been transitioned to this airplane, but to check all his other credentials? That's really the question. Because this is a person who they know from the airport, they know has his own twin, knows flies on business. Flying on business, you fly away from Chicago, you're going to come back and you're going to land at this very same airport. This is something he did all the time. So, yes, there is some interest in the fact that he switched to this airplane. That's a relevant fact, that he switched to this airplane. And the owners know that he wants to switch to their airplane. So, of course, the question they would naturally have wouldn't be, can he fly at night? It would be, has he been properly transitioned to this airplane? Because this is our airplane and it's not the exact same as his. Now, let's talk about the transition to this airplane. That's not really an issue at all, because he did go to a special school to transition him to this airplane, which was the one in Champaign called Recurrent Training Center, which was sued previously and dismissed. Recurrent Training Center's whole purpose was to transition him to this particular airplane. The speeds, the weight differences, any other kind of differences that there are. And they certified that he passed that. So, the transition to the airplane was satisfied, one, because he went to Recurrent Training Center. Secondly, the transition to this airplane was satisfied because, remember, Howard Levinson did fly with him for five hours. That transitioning to the airplane, that was the subject of the five hours that he flew with him, because he knows he's a current pilot. Let me say one other thing about him being a current pilot. We put in our brief, and this court referred to it previously, that Mr. Turek, by the way, this actually happened in January, he went to Recurrent Training in early January, but in the fall, October of the prior year, he completed instrument proficiency check with Arrow, another school. And that school certified him through their instructor, Gene Littlefield. And Gene Littlefield gave a deposition. And in Gene Littlefield's deposition, he said, he was very competent, I found him to be proficient and experienced, and up on his game. Not only did he testify about that, but Howard Levinson also testified that. After he completed that with Gene Littlefield, I telephoned Gene Littlefield. And I asked Gene Littlefield, how did Mr. Turek do? And Gene Littlefield said, he was fine. If you look at Mr. Levinson's testimony, he says he told me he was fine. If you look at Littlefield's testimony, he said he's very much up on his game, he's very proficient, I was simply checking his currency. And he not only went with him in the simulator, he also went with him in the airplane. So this is what is about adapting to the plane. The people who own the plane have checked with a prior instructor. They're aware that he went to a special school. And they flew with him for five hours about the transition to the plane. This is all careful checking about transitioning to this plane. But you're right, they did not get out his logbook and say, now let's see your logbook. But the difference is, he's a competent, experienced, 1,000 hours in twin engine airplane, airplane owner, pilot. Is it their duty? And I submit that the question of duty does exist in this case, because there's a duty or there isn't a duty to inquire to this level. And I think that's what Evans says. And I know your Honor said, well, I think you're creating an extra element. Okay, you can collapse the elements into this way. And that is, when you're checking his transition to the plane, you see nothing wrong. You don't have a problem. You don't have a reason to say, well, now get out your logbook. I want to check the FAA records and see if you have them. Pardon? Why did Nelson get in the plane to say, I'm going to supervise him on this flight? Okay, that's a good question. The record is clear from Mr. Levenson, who's the only one who's alive, because the one being looked at and the one participating are both dead. And there was a conversation that occurred. Here's exactly how it occurred. Friday, Mr. Levenson finished his five hours of flying with Mr. Turek. When he finished, he said to Mr. Turek, you've got your five hours done. You're now all set. You can fly the airplane. And Mr. Turek said, yippee, great, because I have a trip set for Monday, and I would like to take the plane on the trip. That's what Howard Levenson testified to. That meant he was going to go anyway in his own aircraft. Okay, so then he says, yippee, I can take this airplane. I would like to take this airplane. So then Mr. Levenson says, oh, wait. This is exactly his testimony. Oh, wait. I'd better check with my other partner to be sure he's okay with that, too. So Friday night they have a telephone conversation, Mr. Turek. I'm sorry, Mr. Levenson and Mr. Knudsen, the two owners. And they talk about it, and he says, Mr. Turek has finished his five hours. He wants to take the plane on a trip on Monday. And I said that I thought he could. Is that fine with you? Mr. Knudsen says, according to Levenson, yes, he's already called me, and he told me about that. I kind of discussed it with him, and I said, why don't I go along? I'll go along because the two of us are talking about whether or not to make him a partner in the plane. That was the whole purpose of this, was to make him a partner in the plane, the third owner. So Knudsen and Levenson, according to Levenson, were trying to decide whether or not they would make him a partner. So in discussing whether they would make him a partner or not, he clearly wanted to be. By the way, just as an aside, he had given them a check for $20,000, which is referred to in their brief as being for training. No, the record supports that $20,000 was a down payment on the plane, from which if there's any plane expenses when you're flying it on this kind of a trip, or on your five hours, it will be deducted. It wasn't for training. It was to pay for the plane, and then the rest would be used as a down payment or returned. So they had the conversation, and the conversation was, I'll go ahead and I'll go along to observe him for the purpose of deciding whether to make him a partner. I'll come back from the trip. We'll have a conversation. We'll decide. Now, we submitted in our brief quite a bit of points on this, deciding whether to make someone a partner or not. The analysis that we used was deciding whether you're going to join someone to be your partner in a law firm. It's a good example. You don't just ask, does he commit malpractice? Because you're going along and observing him, say, for instance, someone's watching me today. They're not here to watch me to see if they want to have me join their law firm because they think I'm going to commit malpractice up here. They're thinking, do I want that guy to be a partner in my very important enterprise? And the important enterprise of the airplane, this isn't for business. For Howard Levenson, who today is 91 years old, this is his airplane, which is his baby. Secondly, Ken Knudsen testified, didn't testify. Ken Knudsen, according to Levenson, kept calling this airplane his baby. To let another person come in and become your partner is the same, I would submit, as letting someone become your law partner. It's a high level of scrutiny. And by the way, let's get to the throttles, because this is really germane to this point. Why is there so much talk about adjusting the throttles? Because he's going to be a partner, and how you treat the throttles is how much you're going to wear out the engines, and how quickly you wear out the engines is how quickly you'll have to repair them or replace them, which are about $50,000 to $60,000 each.  Because if you chop the throttle, which is right from the deposition, you then hurt the engine, you wear it out prematurely. If you don't crash, you wear it out. Owners care about that. If you stomp on the brakes, which was testified to, something that occurred was a criticism long ago, a number of years previously, that he would jump on the brakes. If you jump on the brakes, you will wear out the tires. You won't have an accident. You'll stop quicker on the runway, but the owners don't like that because it wears out the brakes, it wears out the tires. These are the level of what their concerns were. This is why Knutson went along. This is what's in the record. There is nothing in the record. The man who said supervise, allegedly, is Howard Levinson, but he did not say that in his deposition. Where the supervise word comes from is from a policeman who filed a report on the day of the crash who says Howard Levinson said that. That's the only one word where this supervision ever came into the case. Howard Levinson, when asked to explain it, said, wrong word, wrong word. What he did was go along to observe. Now, I'd like to talk about the throttles just a little bit more because the plaintiff talked about it. He said Howard Levinson had a concern about his use of the throttles from the five hours. That's not supported by the record. That isn't in the record. He did not. He was asked in his deposition, what did you talk about and what did you do? And what he said was the throttles and landings. We did pattern work. Okay, pattern work is typical, normal. By the way, pattern work is what their experts are critical of that led to this crash. Their experts, if you accept their version, and I don't quarrel with it, I'm going to argue it for a second. If he had a bad pattern, which is what they said, he got too tight, too close to the runway, that's a misjudgment in flying. That's not an adaption to this new airplane. That's a misjudgment. And that pattern work was precisely what Howard Levinson did with him on Friday. He did patterns. Patterns are landings. The pattern is the square that you make around the airport to make a landing. So he did the very thing. If you say he should have inquired further, I don't think you could inquire much further than to do the very thing that he was doing the next day, except for one difference, which you've articulated. He did it during the day. He didn't do it at night. Now, I submit one other thing about that. Someone could get up and say, well, that was at day, not at night. When you're checking somebody, if you give them a test, the bar exam. I have the bar exam on my mind because my daughter's here. She just took the bar exam. She was very concerned about it. You know what? It's a testing, a sampling of what you know. It's not everything you know. When you test, and by the way, you could criticize the bar exam and say you didn't test on everything because you're sampling. You're not doing everything unless you say you have a duty to teach. And this isn't about teaching because, remember, teaching has been removed from the case. This is about sampling. The owner's sampling to see if he's adequately prepared to transition to their plane. That's really what it's about. If you think about it, if you're going to let someone take your car towing your RV, you'd want to know that they've done that before. Okay, and you'd ask a few questions. But you wouldn't go out for five hours and ride with them in your car while they're towing the RV. You would sample. You would do a little bit of investigation, but you wouldn't do the same as teaching. So what Mr. Levinson was doing in that five hours, he says, he testifies, I was observing. And he did fine. And that's why I disagree with the statement that he had a problem with the way he used the throttle. It's not in the record, and what's in the record is the opposite. He said he did just fine. He was a competent pilot, and he did just fine. So what he did is sample. And that's why he didn't fly at night. If you want to make him into a teacher, then you say you should have flown with him at night. But I don't think he was a teacher. He was someone saying, here, you can use my plane. And he knows that he flies all the time on business. Remember Morgan Stanley Air. He knows he owns a twin-engine airplane. That's why he's using the flying business. In fact, he knows he had a conversation where he said, yippee, I can use this plane, meaning I was going to take my plane. And one thing else as a pilot, and I think Jill was trying to say this, pilots are taught a lot of law. And the law that they're taught is a thick book of regulations. And in addition to when you're tested by the FAA on flying, you're also tested on what the regulations are. And what the regulations say to pilots are, you are personally responsible yourself for your own preparation for a flight. And here is what you will do. You will do this, and you will do this, and you will do this, and you will do this. And you won't fly if you haven't had this, and you haven't had this, and you haven't had this. And the person that's responsible for that is a pilot in command, right in the ranks. So what pilots would think, knowing he's a pilot, is he's complying with that, unless they have information that he's not. You would automatically think that, by the way, you don't really know I have a license, but you're willing to listen to me up here, because it looks like I know what I'm doing, hopefully. It looks like I'm a lawyer that I'm conversant with the facts. So I believe that testing, looking, what they did, knowing that the FARs would require him to be checking it, that's what was going on here. The fact that they were involved can sometimes give rise to they had a duty, because they were doing it. They were doing it because of the ownership issue, because they were thinking about it. But they weren't doing it because of one other quote that I have to clear up. Everybody knew there was a problem with the way Turek flew this plane. That's another quote from the original argument, and I must clear that up. Everybody did not know there was a problem with the way he flew this plane. Remember, again, that they called Gene Littlefield, and Gene Littlefield said he did great. Now, he did that in his own airplane, I'll acknowledge that, but he flew great on instrument conditions. Secondly, nobody observed him doing anything wrong in this plane. In five hours that went through Friday, and this crash happened on Monday. Secondly, as far as everybody knew, he went to RTC and he had the certificate from RTC about the transition into this airplane. So where would it come that everybody knew he had a problem with this plane? And here's one thing I think Joe is trying to say. If there was something that seemed wrong, then I think Evans says you have a duty to inquire. I think that's what Evans means. Whether you say it's another element or he says it's a red flag, if everything seems copacetic and according to Hoyle, recognizing you didn't thoroughly test, you didn't test every single thing, then I don't think these men could do much more. However, if someone said, oh, have you heard this about Turek, or did you know that he's in an FAA enforcement action, he's having his license lifted, that would be a different circumstance. If he showed up, and by the way, he referred to Kennedy, you know, Kennedy showed up with his foot in a cast. Kennedy took off with his foot in a cast. That's one of the reasons they say that this happened. He would not properly control the airplane. Okay, by the way, and Kennedy's mistake is due to Kennedy. The regulations were on Kennedy. Okay, now, if he showed up with his arm in a sling, that would be something where the owners might say, you know, are you sure you can do this because your right arm is in a sling? How are you going to do the throttles with your right arm in the sling? Or if your left arm is in a sling, how are you going to hold the controls while you're doing the throttles? If there's something that makes them have to inquire further, but if everything seems to be going according to Hoyle, and there's no evidence that anything didn't go according to Hoyle in the training by Arrow, in the training by RTC, and in the training or observing by Howard for five hours, that's all according to Hoyle. Then why is it that they have the duty to say, now get out your logbook, let's look at that? Okay, now one last thing about this thing about nighttime and looking at his logbook in there, and the reason I'm spending time on it is it's true he wasn't current according to the regulations. That's the only thing he didn't have. He had every single thing. That has to be the reason he crashed, for it to be causation or proximate cause. There has to be enough evidence in this case to suggest that lack is why he crashed. One thing you need to know about the regulation is it doesn't say he can't fly. It says he can't take passengers. Even the FAA doesn't say you can't fly. It says in order to take passengers at night, you must do this. Do you know how the FAA expects you to be able to satisfy that? And I do this all the time. You get in the plane by yourself, and you take off and you do three landings, and then you land, and then you say, come on in my plane now and we can go flying. The FAA wants you to have recently practiced in the 90 days. It's 90 days. So that night currency, which he lacked, which we didn't know he lacked, we didn't have reason to know he lacked and would not naturally know he lacked, that night currency has to also be enough evidence that that was the cause. And in this regard, this is what Mike's going to talk about, the sufficiency of proof where you're not just guessing. And I want to talk about circumstantial evidence for a second, because that came up. It's fine to use circumstantial evidence, but that doesn't mean you can just use anything. The law is clear, and Mike will talk about that, that that means it is to be probable that the evidence that you're using makes the conclusion you need probable, not merely possible. Probable. There is no evidence here whatsoever, complete lack of evidence that the nighttime was the reason that he did this. The experts that they submit don't say it was due to the nighttime. They comment about nighttime, and they comment that he got too slow, he was too close to the runway, and he made a misjudgment as to where he was. They say it would not be very easy to fly the plane because it's nighttime, and it was also at the end of a trip, and it was a relatively new airplane. But they don't say why he got too slow. You have to have credible evidence that this particular thing, that we had a duty to look at and find, which I don't agree that we do, because everything was copacetic, but if it was, there's an insufficiency of the proof. If you look at his experts carefully, they don't actually say why he did it. And why he did it is the most important thing in the case, and this is where the cases really matter. Why did Mr. Turek, who was flying, allow the plane to get too slow? Does anybody know? Nobody knows. So how can you say it's because of something that would have been fixed if these pilot's owners did something different? There's no evidence of that, and that's why it's speculation, and that's the other reason why Judge Soganic granted the summary judgment, because there's no evidence to say it's directly related, because there's no question Mr. Turek was negligent. There's no question he stalled. Everybody agrees on that. And I don't dispute their experts who say he got too close to the runway, and that made him in an uncomfortable, bad position. But why did he? That's in his brain. And that's why this is like educational malpractice, and I would hearken back to that decision, that very good, right decision, which is how do we know what's in his brain? How do we know why he did that? How can you say he did that because he wasn't night current, as opposed to he did that because he was tired, or he did that because it was the end of a long trip where he entertained all day, or he wouldn't have done that the same if he was in his own airplane, which is a concept I want to introduce here. He's going in his own airplane. He flies out there. They have the business. They come back. He lands at night at the very same airport, and he does the very same thing. Nobody suggests any evidence that it wouldn't be exactly the same, and that's why the sufficiency of proof is an issue. How would any juror not simply be tossing up a quarter as to what caused this man to do this and to say, well, it might have been the fact, and if you're looking in arrears, it's always easy to say a little more care would have prevented this one. But if you're looking forward, you have to have reason to be nervous and inquire. Those are the facts that I'd like to make. And one last statement, and then I'll sit down and leave the sufficiency of proof to Mike, and that is please carefully check whatever facts that you think are important. I would submit that there's a lack of facts to go the one way and that there's been tremendous misciting to the record. And I believe if you go to the record sites, and we did this in our brief, but we didn't have a chance to respond to the reply brief, of course, I think the facts that are being represented are not supported by the record. I don't believe there are facts, particularly that everybody knew he had a problem. The facts suggest the opposite. And then I'll sit down, unless you have any other questions. I have one question. I don't know if you're able to discuss this, but with the de facto ownership of Siverus, and why did you receive bills after you sold the plane if you were not the de facto owner? I do know the answer to that. Because I was there at the deposition of the accountant for the Siverus. She received the bills because she received all of District of Knudsen's personal and business bills. He was the president and the owner. She testified that primarily what he did when he paid things is he put them on his credit card. Most things he put on his credit card. So his credit card would have half of his charges be business and half of his charges be personal. She would go through his credit card and make the things personal that were personal and make the things business that were business. And then from the personal charges, she would just take it right out of his check, which he authorized her to do. So she would make it personal even though they might appear at the Siverus. You might think the bills were going to the Siverus. A good example would be, say, he had the interior redone in the plane. And at one point he did. If he had the interior redone, he could pay it with his credit card. And then the credit card goes to the Siverus, and the Siverus originally pays the bill. And it may look like the Siverus is funding that. But in reality, that is being taken from his pay. And the reason it has to be carefully accounted for, and I would submit this, first of all, this is in the record by the testimony of Robin. I'm sorry I don't remember her last name, but she's Robin. She's the accountant. She had to account for it very carefully because, remember, Howard Levinson has to pay half. So if Siverus is paying it, you can't make Howard Levinson pay half. So she very carefully kept the airplane charges or any other personal charges separate. So it wasn't really a de facto ownership because the bills might have arrived in that office. She also testified that it was carefully kept separate. Now, if Ken flew on business, he may have submitted a bill to the Siverus to be reimbursed for fuel or something to his company. And that's legit. You know, that's what Mr. Turick did with Morgan Stanley. When he would fly his own airplane on business, he would come, and that was why it became Morgan Stanley Air. This is customary. It's in this case itself, but it's very customary. The pilot would come back and say, I flew on business. I'd like to be reimbursed for my fuel. And that's a normal thing. That doesn't make the airplane owned by Morgan Stanley, and it doesn't do it here either. Finally, on de facto ownership, there isn't law in Illinois that says de facto ownership. I don't think they cite any law. And finally, on de facto ownership, that's only relevant if you're going to say ownership leads to liability. And that's the issue in this case. What does ownership mean? You know, we agree they were the owners, Levinson and Knutson, and they're there to respond as owners, whatever their duty is as owners, and that's what we're arguing to you, is that there's not a duty just because you're an owner to prepare every pilot for every flight that's going to take your airplane, and that's the specific here. When they landed on Friday, Howard Levinson thought he was very competent, and very comfortable in this airplane. But there can be flights later on that are harder than others. The FAA puts that duty on the pilot. The pilot decides if he's going to go or not go. To say that the owners have to get involved in that is to really raise the standard. One last point about educational malpractice. This is about the adequacy of his preparation. Adequacy. That's exactly what the educational malpractice was about. The complaint there was he wasn't really fully prepared. Therefore, you didn't teach him right. This is he wasn't really fully prepared, therefore you didn't check him right. I submit that if you found a duty here to check a pilot for every single thing, because he's going to take your airplane, you're going to make owners become the same as educational malpractice, and the courts are going to face the same problems that the courts cited to as to why we shouldn't allow educational malpractice, which is how do we know what's in his head? How do we know that the reason he did this was because of his preparation as opposed to an oversight? You know, pilots sometimes drop their pen, and if they reach down to get it and look up, the airplane could be in a completely different position. That can happen, and that's negligence of the pilot for reaching down to get it. And that isn't something that you can say is the fault of someone on preparation. How do we know why Mr. Turek did what he did? Did he not walk? Did he take medicine? Was he talking to somebody? Was he entertaining and talking to other people in the plane? Was he trying to do something that he wouldn't otherwise have done because he's showing off? How do we know those weren't the reasons he did this? Where is the evidence at all that this was because of something these guys could have checked in a more thorough check? That's what I would submit. One quick question. Is there anything in the record that shows whether or not Mr. Garland paid any expense for his shared flight? Anyone? Yes. The $20,000 that was referred to in the brace, which I think was improperly referred to as being for training, Mr. Levinson testified about what that was for. He said that was a check written to us for use of the plane for the purpose of becoming able to fly it, which is at five hours, and a down payment on the plane if he will fly it. Now, he flew the plane. If he flew the plane and landed and they said, fine, you're going to become an owner, he would have been responsible as an owner for that flight in the way that the owners are responsible. They kind of reimburse each other. That's what I'm talking about. Turek, the DC. He had paid in advance was the best way to say it. The short answer is he had put $20,000. Oh, Garland. I'm sorry, I thought you meant Turek. I'm sorry. No, there's no evidence in the record whatsoever that he paid. Oh, I would say this about Mr. Garland. He went many times on that Morgan Stanley Air previously. This isn't the first time he got in the airplane. I mean, a airplane. It might be the first time he got in this airplane, but he was in Mr. Turek's airplane previously. Typically, I wouldn't think he'd pay because they would be charging that to Morgan Stanley. You know, if he did the same thing here that he did when on his other business trips, he would be charging Morgan Stanley. By he, I mean Turek, would be submitting the expenses to Morgan Stanley. So Mr. Garland, going along on business, wouldn't be naturally expected to pay. Any other questions? Thank you. Thank you. Good morning, Your Honors. Michael McGruey on behalf of the estate of Knudson. So in my brief, I touched on the issue of duty, the issue of waiver, and the issue of the sufficiency of the evidence that has been presented. I'll talk about each of those points real briefly here for you and answer any questions, of course. Respectfully, I disagree with plaintiffs that duty is not an issue in this case. I think it's all over this case. What the plaintiff is asking the court to do is to impose a duty on the defendants on the estate of Knudson on HK on the Sybaris to prevent a third party from harming Garland. And courts have been loath to impose that sort of duty as a special relationship. And no special relationship exists here. We don't have a parent-minor child. We don't have a master-servant relationship, et cetera. That's just not present here. There's also no law in support of the plaintiff's contention that a duty arises to protect another, to prevent another from committing negligence just by virtue of being a more experienced pilot. This idea of a common carrier as well, which was kind of a throwaway argument in the brief, but to compare the situation here, present, to that of a common carrier is absurd and there's no support in the law for that at all. And that sort of leads me to this idea of waiver. I don't know why the plaintiff doesn't want to address duty. It was found below, Judge Saganek found, that there was no duty to supervise here. And the plaintiff kind of sticks his head in the sand about that. Didn't raise it in the opening brief. Didn't mention it until the reply brief. Didn't even want to raise it today in his opening argument. By not addressing it, we believe he's waived it. The Supreme Court rules require you to raise all arguments that you're going to hold on appeal in your opening brief to give the defendants a chance to respond, and he hasn't done that here. There's also no evidence that there was a voluntary assumption of a duty. According to Bell v. Hutzel, the Supreme Court said to voluntarily assume you need two things, an affirmative act in furtherance and communicate to the person that you're supposedly protecting that you're going to protect them. There's been no indication that either of those elements are satisfied. So there's just simply, there's no duty here. It's not a factual issue, it's a legal issue. Do these circumstances give rise to a duty to protect against harm from third parties? And that's really extraordinary, and it just isn't present here. I'll talk a little bit about the sufficiency of the evidence for a moment. The plaintiff repeatedly argues that he's presented circumstantial evidence, we have enough circumstantial evidence to go to a jury. There's a lot of case law out there that distinguishes between circumstantial evidence and what's improper speculation. The one I'll talk about briefly is Mann v. Producers Chemical, but this language I'm going to talk about is cited in dozens of cases. And that is that liability cannot be predicated on surmise or conjecture as to the cause of the injury. It can be established only where there's reasonable certainty that the defendant's action caused the injury. Now, reasonable certainty can be shown with circumstantial evidence, but only if the circumstances are of such a nature and so related to each other that it's the only probable and not merely possible conclusion. If the existence or nonexistence of a fact, such as approximate cause issues, is equally probable, then there is no reasonable certainty and the circumstantial evidence is improper. So what we're talking about here, and Mr. DeYoung touched on it, is we need a reasonable probability, not just a possibility, a reasonable probability. And the plaintiff has repeatedly argued sports car driver, rides the brakes, this is a new plane, flying at night, etc., etc., all those things that are repeated in his brief over and over again. As Mr. DeYoung said, none of those facts actually explain why the plane crashed. None of them is more likely than the other. None of them is any more likely than other facts, such as it's been a long day, and perhaps Mr. Turek nodded off. Mr. Turek had a client and a subordinate in the plane with him. Perhaps he was distracted. Perhaps he had a coughing fit. Perhaps Mr. Knudsen did take over the flight. We just don't know. None of those is any more likely than the other, and with that sort of circumstantial evidence at issue, it's improper to send it to the jury. And so the main point is that none of the evidence, after years of discovery, and I think we did 70-something depositions in this case, supports any conclusion, any more than another conclusion. Reasonable probability, not just possible. We don't have that here. And perhaps more importantly, if there's no evidence what the defendants did or did not do in the airplane, maybe Mr. Knudsen did take over. We don't know. Maybe Turek refused him or didn't let him take over. Maybe Mr. Knudsen was taking a nap. Maybe he did everything in his power, and maybe he did nothing. There's just no way to know. What you have here is four gentlemen flying through the night sky in a metal tube. There's no recording devices. There's no survivors who can tell us what happened. There's no way to know what happened. And anyone who says that they do know what happened is engaging in unadulterated speculation, and that sort of speculation should not go to a jury. I can wrap up unless you have any questions. Thank you. Thank you. Like I said in JAWS, I think we're going to need a bigger table. I'm the fourth guy. I have Sir Bruce Johnhoff. What you've been presented by the plaintiff is a collection or a cacophony of possibilities, speculation, conjecture, and guess, and that does not rise to the level of being a probability, as Mr. McGorry just explained, and that's not enough to get to a jury. The trial judge is the gatekeeper to prevent just such kind of speculation, guess, and conjecture to get to a jury. We think Judge Logano got it right. He prevented speculation and conjecture as being a substitute for facts to get to a jury. So the plaintiff used the word duty 32 times in his reply brief, and that is near a legal conclusion. It's got to be supported by facts. The record is clear. Zero facts are raised in support of such legal conclusions. On behalf of CBRSS, of course, CBRSS is being asked to be vicariously liable and tied by their president, employee, agent, Mr. Knutson. So if Mr. Knutson didn't do anything wrong, what was it that CBRSS did wrong? The facts were clear that the purpose of the flight was to, Mr. Knutson's being on board that flight, was to observe the operational technique of Mr. Turk. As an aircraft owner, you know, I don't want somebody riding my brakes because I get 300 takeoffs and landings instead of 500. I don't want somebody slamming the throttles because of what's called thermal shock. And if that's how he flew his Baron, God bless him, but I don't want him to fly my airplane because Mr. Levinson's concern was about money, frankly. He was not concerned about safety of flight. You have to ask yourself, would Mr. Knutson have gotten on that airplane on the return leg from Kansas City back to Powahki if he had concerns over his own life because, as one of the previous speakers said, he didn't just entrust an airplane. He entrusted his own life. And when you do that, you have a much higher level of concern. He obviously didn't because he got on the airplane. So the facts just don't support that. He didn't take the drugs until he got on the plane? Sir? He didn't take the drugs until he got on the plane? I'm not sure. I'm saying I'm questioning your logic. I'm saying he didn't have concern about the safety of flight or the competency. But we don't know, from your standpoint or his standpoint, as to what condition he was in when he got on that plane. You're talking about Turk or Knutson? No, Knutson. Well, again, that's why we're left with speculation, conjecture. We don't know. So I'm just saying that contradicts your statement. Well, my point is, if he, Knutson, was competent to fly... We don't know that. Yeah, that's right. Well, likewise, any of the three of you gentlemen get on board United Airlines or Southwest, you don't have a duty to go see the captain's logbooks and maybe he had a bad day that morning with his wife or maybe she had a bad day with her husband. You just don't know. And there's a reasonable reliance doctrine that when somebody has the right credentials to be flying an airplane, there's no duty to look behind that unless there was a red flag. But here, the record is complete. There was no red flag. There was not even a yellow flag that would indicate that there was a safety of flight or a competency issue on behalf of Mr. Turk. Everything that went went to his technique and, frankly, what the cost was going to be to the aircraft owners. Now, several of you had a couple of questions as I went through. Judge Howe, you asked about how is this different from a standard commercial flight. Well, there's a lot of differences between this and a commercial flight. There's no holding out to the public here. Mr. Knutson ran this airplane like he ran his own airplane for his own business purposes. There's nothing that ties any of that to CBRSS. Judge Taylor, you asked about circumstantial evidence. I tried to address that earlier, that this compendium of factoids or possibilities is nothing more than an aggregate of speculation, and the circumstantial evidence has got to be somehow approximately tied, and there's nothing in the record to support that. So this appeal is an attempt to make what's clearly the evidence of negligence on Mr. Turk. There's no question about that. They're trying to tie that to somebody else. Well, Turk may have been negligent, but that's really somebody else's fault or responsibility, and the record just doesn't provide a factual basis for doing that. It's clear he was too slow, and that was what it was. It was a momentary judgment lapse, as Mr. DeYoung properly pointed out, which could happen to any of the three of you or me if I drop my cell phone while I'm approaching a green light. Judge Taylor, you asked about the inability for night landing. I think Mr. DeYoung addressed that. That is not a qualification. It isn't a certification. It's an annotation one has in their logbooks. You self-certify as a pilot. If I'm having a bad cold or I have medical issues, that doesn't fall on some third party. I'm the pilot in command. 91.3 of the Federal Aviation Regulations puts that solely and exclusively on me to be self-qualified and determine whether I'm competent for a flight. They didn't take off at night. The flight got so late in the day that they took off, but then they landed after dark. So there's no evidence showing of any proximate causal relation of that, as Mr. DeYoung addressed. Judge Smith, you had asked, does the circumstantial evidence make it such that the qualifications arise to the level of proximate cause? I don't think there's anything in the record that supports that. Judge Taylor, you had addressed the issue of supervision, and I think that was competently addressed in the record, that there's five hours of Mr. Levinson determining that, in his mind, he was a competent pilot. You have all this level of testing the guy went through with all these formal schools to get him competent and current and make and model. There were no facts to support that there was anything other than a reasonable reliance on the part of either Newtson or Levinson that this guy, periodic bad habits, they don't take it out of the element of judgment. In terms of Syverus, I think you've been explained that Syverus, this flight had zero to do with Syverus. This guy had a buddy there that he had to have lunch with while the three Morgan Stanley guys scampered off and did their Morgan Stanley business. They did go look at a location.  They did go look at a location. While he was there, if this flight had been to go to Cleveland, maybe he had a friend there. The idea of this friend trying to stimulate Mr. Newtson, I think I've got a great location for you to consider to build a property. They went and had lunch, and Newtson said sure, whatever. But that was not the purpose of the flight. They didn't even know they were going to go on that flight until Turek decided, I want to go to Kansas City. And then, while he was in Kansas City, he tried to fill his time with a friend to have lunch, and the friend, I've got this great idea. That didn't turn that into a Morgan Stanley business. I mean, to a Syverus business, if that addresses your question. They could have gone to anywhere, Indianapolis, Detroit, whatever, and if he had a drinking buddy or a flight attendant friend of his or a flight instructor friend of his, it would logically, he'd try to fill his time while the real purpose of the flight, the Morgan Stanley business, was being done with these guys being called. You wouldn't have architected new plans or anything about building a Syverus just because they're having lunch? I believe that's correct, yes. Any other questions related to Syverus, Joan? Thank you. Yes, sir, thank you. The red herring argument, I think, is a red herring. At least the red flag argument is a red herring. But if it weren't, I would think that there were more red flags in this case than the Kremlin on May Day. That's kind of a historical allusion. But all the things that we talked about, Mr. Levinson had no reason to suspect. He had no reason to believe. He had no reason to inquire. And yet he looked up in the sky ten minutes before he got this call and he said to his wife, I hope these guys know what they're doing. Counselors argued that the federal rules of the pilot in command has an obligation to know all of these rules and to abide by them. The same federal rules require the owner who is likewise responsible for those rules. The case they raised, the Ferrari case, talks about that. It says that their responsibility does not extend to a bailee, somebody who rents your plane, but somebody you're authorized to use. They're responsible. And since they mentioned that argument, and this is a case we didn't cite because we relied on Ferrari and it wasn't that big a member of the case, but there's a case called Rogers v. Ray in Texas, which is 435 Federal 2nd, 1389, which discusses that the owner is just as responsible as the pilot for all of these regulations. So you can't just say that it was just Mr. Turek's job. It wasn't part of our responsibility. It was part of our responsibility. Now, I really don't want to, I really do want to hit just the high points. It will be tough. Mr. Levinson told the police that Ken had gone to supervise the flight. When he took his deposition under oath, he acknowledged that that's what he said. So that's what he said. Maybe later he regretted saying it, but that's what he said. And it's fresh evidence of the truth of what he said. So there's it. There's evidence that Ken was going to supervise the flight. There's been comment to check the record, to have a look. It's a big record, and we tried to get everything right. We hope we got everything right. One of the things that I'm sure we got right was the testimony of Mr. Lyons, who was one of the teachers. And, Your Honor, we'll find this on C-1218. And, again, on C-1224, he says he, the teacher, said that Turek's landing patterns were erratic. How does that help their case? He was certified by the R2C, but Mr. Babbitt of the R2C testified at 1243 of the record that that certification doesn't mean that he's competent. It just means that he finished the class. Mr. McGrory says that our case is about that he had a duty to protect. That's never our case. It's not our case. It's our case that they had a duty not to entrust the dangerous instrumentality to somebody who there was reasonable question, you know, about whether or not they could safely use it. That's our case. So I don't think that's always been our case. I don't think we've won anything. Was a case called Van versus Chemical? Quote it? I don't think there's cited here on this. I don't remember. Ultimately, the complaint is that there isn't enough evidence and that it's speculative. We believe that the evidence the record shows takes it beyond speculation. And yet the defendants ask you to affirm, based upon the concept that this accident occurred because Mr. Turek was taking a nap. I believe that, Your Honor, is speculation. Thank you, Judge. Thank you. Thank you very much. We'll take this under advisement. I have to say this was one of the more enjoyable arguments I've heard from all sides here. It was not only just professionally, but kind of fun to listen to. Well, thank you for your preparation. Thank you. To my loved ones, Rick and Ms. Dionne, congratulations. Congratulations. That's the worst TV I've ever had in my life.